# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 13, 2013 Session

## STATE OF TENNESSEE v. JAMES L. DOWELL, III & RIVERA L. PEOPLES

### Appeal from the Criminal Court for Davidson County
### No. 2010-A-459     Cheryl Blackburn, Judge

_____

### No. M2012-00520-CCA-R3-CD - Filed April 30, 2013

_____

A Davidson County jury convicted the defendants, James L. Dowell, III, and Rivera L. Peoples, of five counts of aggravated robbery and five counts of especially aggravated kidnapping. The trial court sentenced each defendant to an effective sentence of 100 years in the Tennessee Department of Correction. On appeal, Defendant Dowell asserts that the trial court erred when it: (1) denied his motion to dismiss for breach of an immunity "Cooperation" agreement with the State; (2) admitted into evidence a form in which Defendant Peoples disclosed Defendant Dowell's phone number; (3) admitted into evidence items obtained from Defendant Peoples's Chevrolet Impala; (4) allowed Agent Richard Littlehale to testify as an expert witness; (5) denied his motion for acquittal; (6) failed to define "substantial interference" for the jury; and (7) imposed a sentence of 100 years. Defendant Peoples asserts that: (1) the evidence is insufficient as to his convictions; (2) the trial court erred when it allowed Agent Richard Littlehale testify as an expert witness; (3) the trial court erred when it failed to define "substantial interference" for the jury; and (4) his sentence is excessive. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JERRY L. SMITH and JEFFREY S. BIVINS, JJ., joined.

Charles Walker, Nashville, Tennessee, for the appellant, James L. Dowell, III.

David A. Collins, Nashville, Tennessee, for the appellant, Rivera L. Peoples

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Bret Gunn, Assistant District

Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This cases arises from two home invasions which occurred on November 23, 2008. As a result, a Davidson County grand jury indicted four men for these crimes, Defendant Dowell, Defendant Peoples, Antonio Harris, and Brian Moreland. Defendant Dowell and Defendant Peoples were each indicted for five counts of aggravated robbery and five counts of especially aggravated kidnapping.

**A. Defendant Dowell's Motion to Dismiss Indictment**

Defendant Dowell filed a motion to dismiss the indictment based upon the State's alleged breach of an immunity agreement. On June 21, 2011, the trial court conducted a hearing on the motion to dismiss the indictment. At the hearing, the Assistant District Attorney General ("ADA") overseeing the case testified that he was involved in the prosecution of the current case, as well as a first degree murder case pending against Defendant Dowell, Harris, Moreland, and Defendant Peoples. Upon their arrest, Defendant Dowell was the only one of the defendants that admitted his involvement. Based upon Defendant Dowell's initial statements to police in the murder case, the ADA believed Dowell might be willing to cooperate on the home invasion cases. The ADA said that he approached Defendant Dowell's attorney about Defendant Dowell's cooperation on the home invasion cases, and Defendant Dowell agreed to meet with the ADA.

The ADA described his meeting with Defendant Dowell as follows:

We didn't do any kind of use immunity or anything like that. I just told [Defendant] Dowell basically what I told the Court here, that he cooperated to begin with, I would like for him to continue to cooperate, that at this point he was only charged in the murder. And since I expected him to talk about his involvement in the home invasion cases that . . . he might have to be charged in those. But ultimately his case, if he cooperated and followed through with everything, we would resolve something on the murder and . . . not on the home invasions. Because he was basically going to be giving evidence against himself.

. . . .

I said, obviously this is contingent upon your cooperation from here on

2

in, your truthfulness from here on in, and your complete honesty about everything from here on in. And everything was cordial, [Defendant Dowell] was good with that, [his attorney] was good with that.

After this discussion with the ADA, Defendant Dowell spoke with detectives and the ADA regarding both the murder case and the home invasions. The ADA explained that, at this point in the investigation, the prosecution did not have any independent evidence of Defendant Dowell's involvement in the home invasions. Thus, the ADA expected that any charges against Defendant Dowell arising from the invasions would likely be dismissed if additional evidence was not developed.

The ADA testified that he set Defendant Peoples for trial on the murder case and provided his attorney with Defendant Dowell's statements. At some point thereafter, Defendant Dowell's attorney gave the ADA a letter Defendant Dowell had written to Defendant Peoples's attorney. The ADA read the letter aloud as follows:

[T]his letter is in regards [sic] of [Defendant] Peoples. The reason I'm writing you is in concerns [sic] of some charges that were brought upon [Defendant] Peoples. I am here to say that my testimony that I gave to [the ADA] and other detectives was false. My statement was made up for the fact that it would help me, and I felt as though I could implicate [Defendant] Peoples in those crimes because, one, he was already under investigation for those crimes and, two, I felt that I know [sic] exactly what the detectives and D.A. wanted to hear. I know that all they wanted was some kind of implication against [Defendant Peoples], so I know that whatever I said they would believe. I felt I should tell you that my statement was false because my untrue testimony could get an innocent person in prison for a long time for crimes he was unaware of even though I was there and committed these crimes. . . . I do accept full responsibility for my actions, and part of accepting responsibility and owning up to things is telling the truth. And once again the truth is that [Defendant] Peoples is completely oblivious to the crimes he is currently charged with. And one reason I implicated [Defendant] Peoples is because other people who assisted me in these crimes are a part of my affiliation, and I could get seriously hurt for snitching on . . . implications of them. And I knew that the detectives already had [Defendant] Peoples as a suspect because of prior interviews they had with him. So out of part fear and complete lies I devised a story to match with what the detectives had as evidence. I felt I could say anything and [they] would let me out of jail. But now I realize I have to own up to my actions, and I can't take innocent people down with me due to my own selfish antics. So I do realize that the State plans to use my testimony

3

against [Defendant] Peoples. . . . I do assure that I will not testify against him, and I do give you full permission to be in contact with me.

The ADA testified that he asked Defendant Dowell's attorney to confirm that Defendant Dowell had written the letter and, after speaking with Defendant Dowell, his attorney confirmed that Defendant Dowell had written the letter to Defendant Peoples's attorney. The ADA explained to Defendant Dowell's attorney that the value of Defendant Dowell's testimony was "greatly diminished if not destroyed" by the letter stating he completely lied about Defendant Peoples's involvement. From this point forward, the ADA proceeded without Defendant Dowell's cooperation. The ADA explained that he did not use any of Defendant Dowell's statements made during their meeting against him during the murder trial. He further stated he would not use the statements against Defendant Dowell during the upcoming home invasion trial.

On cross-examination, the ADA testified that, upon being made aware of the letter to Defendant Peoples's attorney, he did not believe he had enough evidence to proceed against Defendant Dowell without his cooperation on the home invasions, and he communicated this to Defendant Dowell's attorney. Subsequently, however, Moreland, a co-defendant, agreed to cooperate and testify in the case. The ADA also received phone record analysis that, in addition to Moreland's testimony, he believed provided enough independent evidence to prosecute Defendant Dowell in the home invasion cases.

After hearing the evidence, the trial court denied Defendant Dowell's motion to dismiss the indictment.

## B. Trial

At the trial on these charges, the parties presented the following evidence: Ronald Jones testified that he and his wife, Ann Jones, lived in Antioch at the time of the home invasion. Mr. Jones recalled that, around 6:40 p.m. on November 23, 2008, four black men, all carrying pistols, entered his home wearing bandanas that covered their faces, gloves, and hats pulled down to their eyebrows. Mr. Jones estimated that the men were in their late teens to mid-twenties.

Mr. Jones testified that he picked up his wife from work at 6:30 p.m., and they drove the short distance to their home. After exiting their car, as they were walking to the front door, Mr. Jones heard a man say, "[G]et in the house, mother f***ker." Mr. Jones turned around to find four men pointing pistols at Mr. Jones and his wife. Surprised, Mr. Jones asked the men if this was a joke, to which one of the men responded, "It's not a joke, mother f***ker, get in the house." The men pushed Mr. Jones up against the front door where he

4

fumbled for the house key and eventually opened the door. The men pushed Mr. Jones and his wife inside the house and onto the floor where two of the men held Mr. Jones and his wife down. Once inside the house, Mr. Jones said it "just seemed like chaos" with the men demanding various items and their location from the Joneses and "tearing the place up." The men were most interested in "guns, money, and PIN numbers."

Mr. Jones testified that he lived in a three-bedroom house and the men went through every room of the house. The men took several antique guns. One of the men took Mr. Jones's billfold and, after going through it, demanded Mr. Jones's PIN numbers for his bank cards. One of the men, who was sitting on Mr. Jones's back, hit Mr. Jones in the back of his head with what Mr. Jones believed to be the butt of a gun. The men were in the house for approximately forty minutes. Toward the end of this period of time, two of the men went to a nearby Regions Bank ATM to access bank funds. During this time, Mr. Jones and his wife remained on the floor at gunpoint while the two remaining men were in cellular phone contact with the two men at the ATM.

Mr. Jones testified that the two men who went to the ATM returned and "were jumping around [and] carrying on." Mr. Jones overheard one of the men, who was talking on his cellular phone, instruct someone to "pull the car up." One of the men then told the others to leave and said he was going to put the Joneses behind the couch. Mr. Jones said that, when he heard this, he thought, "this is it." The man stood over Mr. Jones holding Mr. Jones's .45 automatic. Mr. Jones recalled that, "He was standing over me jacking shells, pointing that gun at my head," when finally the man reached down, picked up the shells and ran out the door. Mr. Jones jumped up and slammed and locked the door behind the man.

Mr. Jones said that, after locking the front door, he went to the back door to let his dogs in the house. While doing so, he noticed police and an ambulance next door. Mr. Jones ran next door and asked if anyone had seen the men leaving his house, but medical personnel and police officers were busy attending to an unrelated medical emergency and did not notice the men. Mr. Jones told the police officers what had occurred and the officers followed Mr. Jones back to his house where they called for additional police support to assess the crime.

Mr. Jones testified that the rooms of his house were "torn all to pieces." He said that he was not free to move about while the men were in his home. He recalled that, at one point, one of the men asked who wanted to be shot first, and Mr. Jones volunteered, "Shoot me."

On cross-examination, Mr. Jones testified that police showed him a photographic line up, and he was unable to make an identification of any of the men. Mr. Jones explained that it was difficult to see the intruders because his head was flat on the ground.

5

Ann Jones testified consistently with her husband's testimony regarding the home invasion. She recalled that one of the men wore a "brand spanking new" pair of white tennis shoes. She said that the men took a laptop, a camera, her son's gaming system, and guns. After going through Ms. Jones's purse, the men began inquiring about her bank account. Ms. Jones said that it did not appear the men had intended to use her bank card initially but decided to try to access her money through the bank once inside her home. She recalled that, as the men decided whether the ATM card was of any benefit, they forced her to call the bank's automated system to confirm the balance in the account. Ms. Jones wrote down the PIN number associated with her bank card and then two of the men left. Ms. Jones said that the men accessed either $500.00 or $600.00 through the Regions Bank ATM with her bank card. The men who went to the ATM and the men who remained with the Joneses in the house communicated by cellular phones. Ms. Jones recalled that the men threatened her saying, if her son, who lived with the Joneses, walked through the door, they would kill him.

On cross-examination, Ms. Jones testified that police showed her several photographic line ups. She identified one picture and told the detective she was "eight-five percent" sure he was one of the intruders. She explained that "it was virtually impossible for us to identify somebody's looks when we couldn't see them because they were covered up and our heads were held to the floor with a gun." Even so, as to the one photograph, she said she had "a strong feeling" and there was "something about his look."

James Stadler testified that, on the night of November 23, 2008, he was at home with his daughter, Blake Stadler, and her boyfriend, Sloan Sanders. Stadler explained that the front door to his home had both a glass door and a "regular" door. At the time of these events, the "regular door" was opened, and the glass door was closed. Stadler recalled that, at around 8:30 p.m., while he and his daughter were in the "den" and Sanders was in the kitchen getting ice cream, four men entered the house through the front door. The men wore bandanas, skull caps, and gloves. Stadler said the men were black, and he estimated their ages were between "late teens" and "early twenties," based on their mannerisms. Stadler noticed a mark, he later learned was a little tattoo, near one of the intruder's eyes. One of the men walked over to Stadler and pointed a pistol at his head. Stadler, surprised by the men's entrance, pushed the gun away thinking it was "a joke." The man pulled the gun back and fired the gun into the chair in which Stadler was seated.

Stadler testified that the man ordered him to lay on the ground on his stomach. The men asked the location of Stadler's safe containing guns and money. Stadler told the men that he did not have a "safe full of cash" or any pistols. Instead, Stadler gave the men the only cash he had, $70.00 or $80.00 from his wallet. After repeated questioning, Stadler told the men that he had a safe downstairs where he kept shotguns and a small safe that contained

6

a penny collection.

Stadler testified that the men ordered him and Sanders downstairs to open the safes. Stadler retrieved the key to the lock on the door and the combinations to the safes for the men. Stadler said that the men appeared "fairly disappointed" upon opening the safe and finding no pistols or cash. The men then pointed a gun at Stadler's head and asked where the "cash" was, to which Stadler responded that his money was in the bank. One of the men asked if Stadler had his ATM card and, when he told the man yes, the man said, "all right, let's go."

Stadler testified that the men ordered him, his daughter, and Sanders to get into his daughter's Toyota Highlander, which was parked in front of the house. The man who shot into Stadler's chair in the house drove the car, the shortest of the intruders sat in the passenger seat while Stadler and Sanders sat in the backseat with Stadler's daughter lying on the floorboard. A third man sat in the "back area" and held a gun to Stadler's head. The fourth man followed the Highlander in a gray Buick. First, they drove to a Bank of America approximately five minutes from Stadler's house. On the way to the ATM, the driver received a phone call during which he gave the caller directions to the bank. When they arrived at the ATM, the driver attempted to withdraw $5,000.00 which is more than the daily maximum allowed for withdrawals. The driver then successfully withdrew $500.00. He attempted to withdraw money in lowering amounts, all of which were denied until he selected $100.00, for a total of $600.00.

Stadler testified that they next went to his daughter's bank, which was nearby. The Regions Bank ATM was not a drive-through, so the driver parked the car and walked up to the ATM. After some difficulty, he returned to the car and asked Stadler's daughter for her ATM number again. She provided it, and he returned to the ATM. After some time, the man in the passenger seat appeared to be frustrated with the delay and got out of the vehicle and withdrew the money from the ATM.

Stadler testified that, after retrieving the money from both of the ATMs, he asked the men several times to take the car and let Stadler, his daughter, and Sanders go. The men ignored Stadler's repeated requests and drove to a "little subdivision." Stadler again urged the men to take his daughter's car and leave them behind. The men agreed and instructed Stadler, his daughter, and Sanders to stay in the car and count to twenty. The men exited the car and walked to the Buick which was behind the Toyota Highlander. All four men then returned, got into the Highlander, and announced there was a "change of plan." One of the men drove the Highlander about a hundred yards, stopped the car, and told the victims to get out and "don't look back." Stadler, his daughter, and Sanders got out of the Highlander and laid on the ground while the men drove away.

Stadler testified that he went to a nearby house and asked for someone to call police. When police arrived they inspected the Buick, which had the lights still illuminated and was out of gas.

Stadler testified that throughout this event the men were aggressive and threatening. He said the men poked him in the back of the head with the barrel of the gun, kicked him while he was on the floor, and threatened multiple times to kill him. Stadler recalled that the man doing most of the talking and demanding was noticeably shorter than the other three men. Stadler said that the men took a laptop computer, some coins, a hunting bag, a hunting knife, a silverware carving knife, and cash. Stadler said that, during the course of these events, he was held at gunpoint and not free to leave or move about at his own will.

Stadler testified that he was most concerned for the safety of his daughter and Sanders. He recalled that as they were driving to the first ATM, his daughter, who was on the floorboard, pulled at his pant leg. Stadler said he tried to get her to stop, but it was "like she was trying to tell [him] something or, . . . show [him] something." He told her not to move. Later, he asked his daughter why she was pulling at his pant leg and she said, "I wanted to tell you I loved you in case we die tonight."

On cross-examination, Stadler agreed that, shortly after the home invasion, he told a police officer that there were five to six black men who entered his home. He said that he had "debated back and forth" but believed there were four. On recross examination, he confirmed that there were three men in the his daughter's Highlander and one man in the Buick following them.

Blake Stadler testified that she was at home with her father and boyfriend on the night of November 23, 2008. Ms. Stadler recalled the events of the night consistently with her father's testimony. She added that, after she told the men where her father's wallet was located, one of the men took her to find the wallet, which contained $100.00. The man then forced Ms. Stadler to go through the drawers in the bedroom, demanding to know where money was kept in the house. Ms. Stadler described the man as "pretty violent" toward her. Ms. Stadler led the man through the house hunting for money, but was unable to find more than about $2.00. Once Ms. Stadler's father told the men that his money was in the bank, the men began discussing how they would get to the bank and access the money.

Ms. Stadler testified that, when they were getting into her car to go to the bank, one of the men shoved her to the floorboard where she remained until she was released. Because of this position, she was unable to tell where they were driving. Based upon the conversation in the car, she knew when they were stopped at a bank but did not know which bank or the bank's location. The men asked Ms. Stadler for her PIN number multiple times and

8

ultimately withdrew approximately $200.00 from her bank account.

Ms. Stadler testified that, at one point while in the house, she lost sight of her father and Sanders. When she attempted to look for them, one of the men yanked her back by her hair. She said that, during the encounter, the men threatened to kill her, shoved her on the ground, kicked her, and pulled her up off the ground by her hair.

Sloan Sanders testified that he was at the Stadlers' home on the night of November 23, 2008. Sanders said that he was in the kitchen getting a bowl of ice cream when he heard what sounded like the television exploding. He then heard Ms. Stadler screaming, "take whatever you want, take whatever you want" and realized someone was in the house with a gun. He walked toward the living room and was met by a man pointing a gun at him. The man ordered Sanders onto the ground next to Stadler. The men began cursing and screaming at the victims, demanding to know where they kept guns and money. Sanders offered that there was a hunting safe downstairs. The men ordered him and Stadler to go downstairs and show them the hunting safe. As they walked downstairs, one of the men pressed a gun into Sanders spine while another man drug Ms. Stadler upstairs. Once in the basement, Sanders was told to get on the floor again while Stadler helped the men open the safe. Sanders said that, at this point, the men threatened to kill him, and he believed he was going to die.

Sanders testified that eventually the men led him and Stadler back upstairs. He described the men as not having a "solid plan" and "arguing." The men took Sanders's cellular phone and wallet. Sanders recounted the trip to the banks and their release consistently with Sadler and Ms. Sadler's testimony. He confirmed that three men exited the Highlander and then, shortly thereafter, four men entered the Highlander, and they drove a short distance before allowing Stadler, Ms. Stadler, and Sanders to exit the Highlander.

On cross-examination, Sanders testified that there were four or five men in the Stadler's home. He explained it was hard to tell how many because he was lying on the floor. He said the men all wore knit hats and had bandanas covering their faces. The men wore gloves and dark clothing with long-sleeves. From the gap between the bandana and the hat, Sanders could see that the men were black.

Marsha Brown, a Metropolitan Nashville Police Department detective, testified that police were notified of the Stadler's home invasion at 9:26 p.m. on November 23, 2008. Detective Brown met with the victims in a small neighborhood where the victims were released. The victims directed her to an abandoned 1992 silver Buick Century which had been left behind by the suspects. Detective Brown learned that the Buick had been reported stolen and that the registered owner was Deborah Fowlkes. The detective observed a broken window on the car. Detective Brown said that she processed the Buick for fingerprints,

9

evidence, and items that might contain DNA. She collected fingerprints that were sent to the Tennessee Bureau of Investigation ("TBI") for analysis and recovered a cigarette butt and several ATM receipts from inside the car. Detective Brown read the date and time, November 23, 2008, 7:35 p.m., and location, Harding Mall, from one of the ATM receipts.

Detective Brown testified that she also recovered video surveillance footage from the Bank of America and Regions Bank ATM machines located on Hillsboro Pike. Ms. Stadler's Toyota Highlander was recovered nine days later, and Detective Brown ordered the Highlander to be processed for fingerprints.

Deborah Fowlkes testified that she lived in an apartment complex on Edgehill Avenue in Nashville, Tennessee. On the night of November 23, 2008, a policeman came to her apartment door and notified her that her car, a silver/gray 1992 Buick Century, had been stolen from the apartment complex parking lot. She stepped outside with the officer and observed the broken glass on the ground in the area where her car had been parked. Fowlkes recalled that she had noticed "several boys hanging out and looking at her car" during the few days leading up to this event. Their presence had caused her concern, and she had frequently looked out the window over the course of those days to check on her car. Fowlkes denied giving anyone permission to use her car and testified that she did not know either of the defendants.

Lisa Whitaker, a Metropolitan Nashville Police Department crime scene investigator, testified that she responded to a call in Green Hills in relation to an abandoned vehicle. Whitaker, however, was unable to process the vehicle for evidence because police could not establish that the vehicle was stolen, so it was towed to an impound lot for later processing. Whitaker said she then proceeded to the Stadler's residence. While there, Whitaker collected latent finger prints from the front storm door and door knob that she submitted for analysis.

Stanley Green, a Regions Bank employee, testified that he worked in the area of investigator assistance, conducting research and "answering general calls." Green said that police contacted him in late November 2008 requesting video surveillance footage from two separate Regions Bank ATM machines. The first was located on Nolensville Pike, and the transaction involved Ms. Jones's bank account. The other was an ATM located on Hillsboro Pike in Green Hills, and the transaction involved Ms. Stadler's bank account.

Green first testified about the Nolensville Pike ATM machine. He said that he isolated the relevant video surveillance footage and delivered the images to the police. The State played the video of the transaction at the ATM on Nolensville Pike for the jury. Green identified the date, "11-23-2008" and time, "7:31 p.m.," of the recording that was located on

10

the left-hand side of the screen. During the recorded transaction a portion of the account number accessed is displayed on the screen. Green confirmed that the account number accessed was Ms. Jones's bank account and that the amount of $400.00 was withdrawn. In further the video footage, an additional $20.00 was withdrawn. Although not all of the transactions were shown on the video surveillance recording, Green testified that he had a complete list of the transactions made on Ms. Jones's account the night of November 23, 2008. In addition to those shown on the video footage, there were additional transactions for a total amount of $600.00 withdrawn from Ms. Jones's account. Green testified that the last transaction made on Ms. Jones's account was at 7:35 p.m.

Green also testified about the transactions made on Ms. Stadler's account the same night at the Hillsboro Pike Regions Bank ATM. Green prepared a disc of the relevant video surveillance footage and provided it to police. The State played the video footage for the jury. Green again pointed out the time of the transaction, which was shown on the video footage as 9:12 p.m. Green identified an SUV in the frame, which appeared to be followed by a passenger vehicle.

Trudy Hardin, a Bank of America fraud investigator, testified that police requested footage taken through a video surveillance camera on November 23, 2008, at a Bank of America ATM machine located on Hillsboro Pike in Green Hills. Hardin said that she isolated relevant footage and provided it to police. Hardin also confirmed activity on Stadler's bank account the night of November 23, 2008. The State played the video footage for the jury. Based upon bank records, Hardin said that the first transaction involving Stadler's account was made at 9:11 p.m. and the last transaction occurred at 9:12 p.m.

Chris Barnard, Tennessee Department of Correction special agent, testified that his job included criminal and administrative investigations for the Department of Correction. Barnard explained that when inmates enter the Department of Correction they receive a medical examination, and all of their tattoos and scars are photographed. These pictures are downloaded into a database and stored by the inmate's Department of Correction number.

Barnard testified that police requested photographs of Antonio Harris's tattoos. Barnard identified a picture taken on March 2, 2006, of a tattoo on Harris's left forearm that read "Jada."

James Howard Patterson, a TBI special agent, testified that he was asked to conduct a tattoo comparison for this case. Police provided video footage taken at an ATM and the Department of Correction photograph of Harris's tattoo. Patterson said that the tattoo from the ATM video footage and the tattoo from the Department of Correction photograph appeared consistent.

11

Jill Weaver, a Metropolitan Nashville Police Department officer, testified that, during the course of the investigation in this case, Defendant Peoples and Antonio Harris were developed as persons of interest. She explained the relationships between the four co-defendants, saying that Defendant Peoples and Harris were brothers. Defendant Peoples was the father of Defendant Dowell's sister's children and Defendant Dowell was dating one of Defendant Peoples's sisters. Moreland, another co-defendant in this case, was also dating one of Defendant Peoples's sisters. All of these men either lived in the Edgehill area or had girlfriends who lived in the area.

Detective Weaver determined that Defendant Peoples owned a Chevy Impala. On the night of December 10, 2008, the detective located the Impala at 1073 Edgehill. The detective identified photographs of the Chevy Impala that displayed items found in the car. In the back seat passenger area of the car, police found white tennis shoes, a white t-shirt, black knit gloves, a red umbrella, and bandanas. Detective Weaver said that she directed that the Chevy Impala be towed for further processing by the Identification Unit. As a result, she came into contact with Defendant Peoples, whom she identified in court.

Detective Weaver testified that she showed Defendant Peoples the Bank of America video surveillance footage involving Stadler's bank account, which included the portion of the tattoo that was visible on the ATM footage. Three days later, Detective Weaver met with Antonio Harris and observed the tattoo on Harris's arm. The tattoo was consistent with the video surveillance footage, but it appeared Harris had made an attempt to cover up the original tattoo by adding balloons and the birth date of one of his children. The area of the additional tattoo was still swollen and puffy, indicating the tattooing was recent. Detective Weaver explained that the original tattoo "Jada" was the name of one of Harris's daughters. Detective Weaver identified Harris's mug shot noting the tear drop tattoo below both of Harris's eyes.

Detective Weaver testified that she obtained cellular phone records and DNA samples from each of the defendants in this case. Detective Weaver said that Defendant Dowell was "markedly shorter" than the other three men charged in these crimes.

Brian Moreland testified that he was charged in this case along with Defendant Peoples and Defendant Dowell, and he admitted his involvement in the November 23, 2008, crimes. Moreland testified that he first met Antonio Harris while dating one of Harris's sisters. Through Harris, he met Harris's brother, Defendant Peoples and, later, Defendant Dowell. He explained that Defendant Peoples had a child with one of Defendant Dowell's sisters.

Moreland testified that on the night of November 23, 2008, Harris, Defendant Peoples,

12

Defendant Dowell and he went to the Joneses' home in Antioch. Moreland explained that the men drove to the home in a Buick that they had stolen in Edgehill. He said that all of the men were armed with a gun except for Defendant Peoples. When asked why the defendants chose the Jones home, Moreland responded, "We seen them getting out of the car." Moreland said the Joneses were ordered onto the ground once inside their home, and they complied. The men asked the Joneses where they kept their money and guns in the house. Ultimately, the men found and took rifles, a laptop, and a cellular phone. Moreland denied seeing anyone hit either of the victims during the home invasion. Moreland denied any use of drugs or alcohol that night. He agreed that the guns were used to threaten the Joneses and enforce their compliance. At one point, Defendant Dowell and Defendant Peoples left the house to go to an ATM. While they were gone, he and Harris, who stayed behind, communicated with them via cellular telephones.. Defendant Dowell and Defendant Peoples returned with money from the ATM, and the men left in the Buick.

Moreland testified that the four men then went to the Stadler residence, selecting this residence because the front door was open when they drove past the house. The men entered the house, and Harris fired a shot when the men first entered. From this house, the men took a laptop, bank cards, and cellular phones. Moreland said that, this time, they took the victims with them to go to the ATMs. Moreland said that he rode in Ms. Stadler's SUV with Harris and Defendant Dowell while Defendant Peoples followed them in the Buick. He recalled that the first ATM was a drive-through, and the second ATM was a "walk-up." Moreland said that, at the second ATM, Harris walked up to the ATM first, followed shortly thereafter by Defendant Dowell, who had been sitting in the front passenger seat. Moreland said the plan was to pull to a "side road" and leave the victims and the SUV; however, the Buick "stopped working," so the men ordered the victims out of the car and drove away in the SUV.

Moreland testified that the four men shared the proceeds, but he did not recall the amount of his portion. He said the items taken at the two residences were sold, and he sold the SUV to a man for $20.00. Moreland said that all of the men wore bandanas and gloves during the home invasions. Moreland recalled that, shortly after these events, Defendant Peoples bought an Impala. Moreland said that the police seized the Impala and found the bandanas, caps, and gloves that the men had worn during the home invasions.

Cassaundra Waters testified that in 2008 she was in a relationship with Defendant Peoples. Waters's roommate at the time was involved in a relationship with Defendant Peoples's brother, Harris. Waters said that, through Defendant Peoples, she met Defendant Dowell and Moreland. She said that she often saw Defendant Peoples, Defendant Dowell, Harris and Moreland together. Waters recalled the news reports on a home invasion in Green Hills. Upon seeing an article in the newspaper about the Green Hills home invasion, Defendant Peoples told Waters that he, Defendant Dowell, Harris and Moreland were

13

involved in the home invasion. Thereafter, police questioned Waters about Defendant Peoples's activity on several occasions. Waters said that she never told police about Defendant Peoples's admission to her. Within two weeks to a month after the home invasions, Waters reunited with her husband and broke off her relationship with Defendant Peoples. Police continued to question Waters even after the relationship ended, and she eventually told police what Defendant Peoples had said to her after seeing the newspaper article.

Lynette Mace, a Metropolitan Nashville Police Department officer, testified that she processed Defendant Peoples's 1999 Chevy Impala. She said the vehicle was photographed, fingerprinted, and vacuumed. Additionally, she collected evidence from the car and conducted a gunshot residue test. From inside the car, police recovered two black toboggans, a red umbrella, a white shirt, a pair of white tennis shoes, four pairs of black gloves, a partially smoked cigarette, and four bandanas. Police also found in the car a bill of sale for the car, a wallet, a key, a lottery ticket and a Tennessee driver's license belonging to "Rivera Letroy Peoples."

Jerome Osei-Bonsu testified that he owned a used car lot in November 2008. In 2009, police contacted him requesting information about a gray Chevrolet Impala that Defendant Peoples purchased from the lot. Osei-Bonsu said that he provided documents from the sale to police that indicated that Defendant Peoples paid $500.00 as a cash down payment for the Chevrolet Impala on November 24, 2008. Defendant Peoples provided his cellular phone number and a reference sheet. He listed Antonio Harris, Brian Moreland, James Dowell, and Shameka Harris, with their contact phone numbers, as references for the purchase of the car. Osei-Bonsu testified that the documents required that Defendant Peoples make bi-weekly payments on the vehicle. Osei-Bonsu's records indicated that Defendant Peoples had only made one payment.

Michael Turbeville, a TBI special agent, testified as an expert in the field of serology and DNA analysis. Agent Turbeville received a partially smoked cigarette found in Defendant Peoples's Impala for DNA testing. The DNA profile found on the cigarette butt matched the sample of Moreland's DNA that was also submitted to the lab for testing.

Agent Turbeville testified that he also conducted testing on a glove found in the trunk of the Impala. Because of the minimal amount of DNA on the glove, Agent Turbeville was unable to determine the contributor of the substance. Agent Turbeville said that he also tested a set of gloves found in the backseat area of the car. The first glove contained a DNA mixture of three individuals: Harris, Defendant Peoples, and Defendant Dowell. The second glove was a mixture of three or more persons. Due to the complex mixture of the DNA on that glove, Agent Turbeville said that he could not exclude Harris, Defendant Peoples and

14

Defendant Dowell as contributors. There was an indication of a fourth individual.

Agent Turbeville testified that he tested a black bandana and a set of gloves found in the glove compartment of the vehicle, and the DNA profile matched Harris. Agent Turbeville found that the first glove contained a mixture of the DNA of three people, and it appeared that Harris and Defendant Dowell were the two major contributors. Moreland could not be excluded as the third contributor to the DNA. The second glove also contained a DNA mixture of three or more people. The mixture was consistent with Harris and Defendant Dowell as the major contributors. On the second glove, however, it was Defendant Peoples who could not be excluded as a minor contributor.

Agent Turbeville also tested a set of gloves and bandana found in the back seat of the vehicle. The bandana contained a mixture of DNA that matched to Harris and Defendant Dowell and indicated Moreland could not be excluded as a minor contributor. The first glove tested revealed a mixture of three or more people. Harris, Defendant Dowell, and Moreland's DNA standards were consistent with three of the contributors, and Defendant Peoples could not be excluded as a minor contributor of the DNA material. The second glove was a mixture of three or more people. Defendant Peoples, Defendant Dowell, and Moreland were consistent with three of the contributors and Harris could not be excluded as a contributor of the DNA material.

Agent Turbeville tested bandanas found in the back pocket of the passenger seat. The first bandana contained a mixture of DNA consistent with the DNA standard submitted for Defendant Peoples and Moreland. The second bandana contained DNA that matched to Defendant Dowell.

Agent Turbeville tested a second cigarette butt and found the major contributor was Defendant Dowell and a second contributor was an unknown female. A toboggan found on the right rear floorboard of the vehicle contained a DNA profile that matched Harris. Another toboggan found in the front seat of the vehicle contained a DNA profile that matched to Harris and a partial profile that matched to Defendant Dowell. The DNA profile recovered from the white tennis shoes was consistent with Defendant Peoples as one of the contributors of the DNA.

Agent Turbeville tested a white t-shirt and found mucous on the left sleeve. The DNA profile from the mucous matched to Defendant Peoples, and Defendant Peoples could not be excluded as a contributor to additional DNA collected from the collar of the t-shirt.

Russell Davis, a TBI special agent, testified as an expert witness in the field of microanalysis. Agent Davis explained that gunshot primer residue is material that is expelled

when a weapon is fired. Agent Davis said that he used a scanning electron microscope to determine the presence of gunshot residue.

Agent Davis testified that police provided several items for gunshot residue testing. The first item was a white glove found in the trunk of Defendant Peoples's Impala. The results of testing revealed the presence of particles consistent with gunshot residue. Agent Davis stated that he was unable to confirm the substance was gunshot residue because only two of the three metals found in gunshot residue was present. The two sets of gloves found in the back seat of the vehicle and the gloves found in the glove compartment were tested, and Agent Davis found the presence of particles unique to gunshot primer residue on all three sets of gloves.

Larry Farnow, a Metropolitan Nashville Police Department officer, testified as an expert witness in the field of latent fingerprint identification. Officer Farnow said that he worked in the Identification Division Latent Unit examining latent prints and determining their source. Police requested that Officer Farnow examine fingerprints developed at the Stadler residence. Officer Farnow said that the fingerprints had no value, meaning he was unable to initiate a comparison to anyone. Latent fingerprints taken from the Buick were also submitted for analysis, and Officer Farnow found the prints identifiable but did not find a match for identification. Officer Farnow also analyzed latent prints taken from Ms. Stadler's vehicle and found they matched to individuals[1] other than the four co-defendants in this case. The latent prints taken from the CDs found inside the vehicle were identifiable and matched to individuals other than the four co-defendants.

Belinda Shea, a Metropolitan Nashville Police Department officer, testified as an expert in the field of latent print identification. Officer Shea examined prints submitted from the Impala. A latent fingerprint taken from a CD found inside the vehicle was matched to Defendant Peoples. Moreland's fingerprint was identified on another CD found inside the Impala. Defendant Dowell's and Defendant Peoples's fingerprints were also found on items inside the Impala.

Detective Brandon Dozier, a Nashville Metropolitan Police Department officer, testified that as he received additional information during the course of the investigation he compiled various photographic line ups to show to the Joneses. Ms. Jones identified Demarion Baye in one of the photographic line ups. Mr. Baye's fingerprint was also found on an item inside Ms. Stadler's Highlander. Based on this information, Detective Dozier obtained a warrant for Mr. Baye's arrest that the District Attorney's office ultimately

---

[1] The fingerprints matched to the individuals in possession of the Highlander at the time of recovery by police.

16

dismissed. Detective Dozier testified that, at the time, he felt he had sufficient probable cause to arrest Mr. Baye. In retrospect, however, due to the Joneses' limited ability to see their assailants and the length of time the Highlander was "on the streets," he believed the decision to arrest Mr. Baye was not a "good decision."

Jim Merkling, a Cricket Communications customer operations manager, testified that in the latter part of 2008, police requested records for four cellular phone numbers for the dates November 23, 2008, through November 29, 2008, and for December 9, 2008, through December 15, 2008. Merkling stated that the phone records requested did not indicate the owners of the phone numbers.

Richard Littlehale, a TBI special agent, testified as an expert witness in the area of telecommunication records in criminal investigations. Agent Littlehale explained that a cellular phone is basically a two-way radio with a transmit function and a receive function that interacts with a network of cell towers. Generally, the closest cell tower is used to transmit a phone call, however, other factors such as high use of a particular tower or irregularities in the environment may cause a different tower to transmit the call. Agent Littlehale said that late at night and early in the morning are often times where the call volume is low and, thus, there is less need for a particular call to be shifted to a more distant cell tower. He said that, in urban Nashville, Cricket cell towers are located between one and two miles apart with a little more distance in rural areas.

Angela Gardner testified that she had been employed with the Regional Organized Crime Information Center, a federally funded law enforcement support agency, for eighteen years. Gardner said her job as a criminal intelligence analyst entails organizing and analyzing case information to help better present the material at trial.

Gardner testified that Nashville police provided her with cellular phone data for this case. Specifically, Gardner focused on November 23, 2008, data from 6:00 p.m. to 10:00 p.m. She testified that she looked for phone calls placed between the four cellular phone numbers she was provided and the cell towers used to transmit those calls. Based upon the records, Gardner created a chart of her findings. Gardner said that she could not testify as to who placed the actual phone calls but relied upon the names associated with the cellular phone numbers as written by Defendant Peoples on the reference sheet portion of the sales contract for the Impala.

The State displayed the chart Gardner created, which was a map of southern Nashville. On the chart was the Jones residence, the Stadler residence, the location of the victims release, the ATM machines accessed during these crimes, and the cell towers used to transmit calls. Gardner testified first about the phone number associated with Harris. The

17

first relevant phone call was at 6:03 p.m., and the next five phone calls occurred between 6:14 p.m. to 6:21 p.m. These calls were transmitted through a tower very close to Edgehill Avenue. At 6:29 p.m., the cell tower used was located on Nolensville Pike, and at 6:38 p.m. the cell tower used was located near Franklin Pike in the Berry Hill area. Calls eleven through sixteen were transmitted through cell towers located near the Jones residence and were placed between 6:47 p.m. to 7:50 p.m. All of the phone calls were between Harris's cell phone and cell phones associated with other co-defendants in this case. At 7:56 p.m., the calls from Harris's cell phone were transmitted through a tower closer to downtown Nashville. At 8:21 p.m., the calls from Harris's cell phone were transmitted through a tower near the center of Nashville. At 8:28 p.m., the calls from Harris's cell phone were transmitted through a tower located near Hillsboro Pike. Thereafter, a series of phone calls were transmitted through a cell tower close to the Stadler residence. Two more calls were transmitted using a tower near the Bank of America ATM on Hillsboro Pike. After a call associated with the phone number for Defendant Peoples, the remainder of the calls associated with Harris's phone were transmitted through a cell tower located near Edgehill Avenue from 9:33 p.m. to 9:59 p.m.

Gardner next testified about the phone associated with Defendant Peoples. The chart indicated that the locations shown for cell phone transmission were the same as Harris's and the time frames were the same. Gardner said that twenty of the phone calls on Defendant Peoples's phone records were associated with Harris during this time period.

The State displayed the chart for the phone records associated with Defendant Dowell. Seventeen calls were handled by the phone associated with Defendant Dowell during the time frame analyzed. The first three calls, occurring between 6:13 p.m. to 6:26 p.m., were transmitted through a tower located near Edgehill Avenue. After a 6:34 p.m. call, there was no cellular phone usage until 9:05 p.m. A call occurring at 9:05 p.m. was between Defendant Dowell's phone and a phone associated with Defendant Peoples. Phone calls transmitted between 9:13 p.m. and 9:20 p.m. were transmitted by cell towers near the Bank of America ATM machine. Phone calls from 9:32 p.m. through 9:58 p.m. were transmitted through cell towers near Edgehill Avenue.

Gardner testified about the chart she created for the cellular phone associated with Moreland. This cell phone either placed or received thirty-four calls during the period of time analyzed. The initial call was placed at 6:13 p.m. in the Edgehill area. Eight phone calls were made or received on this phone between 7:04 p.m. and 7:28 p.m., and the cell tower used to transmit the calls were located near the Jones residence. One of the calls was to Defendant Peoples. Two calls were made or received using a cell tower near the Stadler residence at 8:47 p.m. and 9:04 p.m. One of these calls was, again, between Moreland's phone and a phone number associated with Defendant Peoples. Phone calls transmitted from

18

9:31 p.m. to 9:59 p.m. were transmitted through the tower near Edgehill Avenue.

Gardner testified that, between 9:04 p.m. and 9:21 p.m., five phone calls were placed between two of the co-defendants. Three of the calls were between Defendant Peoples and Defendant Dowell, one call was between Defendant Peoples and Moreland, and one was between Defendant Peoples and Harris. All of these calls were transmitted using the same cell towers located in the area of the Stadler residence and the bank ATM machines used during the commission of these offenses.

Based upon this evidence, the jury convicted both of the defendants of five counts of aggravated robbery and five counts of especially aggravated kidnapping. The trial court sentenced each defendant to ten years for each of the aggravated robbery convictions and twenty years for each of the especially aggravated kidnapping convictions. The trial court then ordered partial consecutive sentencing for an effective sentence for each defendant of 100 years. It is from these judgments that the defendants now appeal.

## II. Analysis

The defendants together challenge: (1) the sufficiency of the evidence; (2) the qualification of Agent Littlehale as an expert witness; (3) the trial court's failure to define "substantial interference" to the jury; and (4) the sentence. Defendant Dowell additionally asserts that the trial court erred when it: (1) denied his motion to dismiss for breach of an immunity "Cooperation" agreement with the State; (2) admitted into evidence a form in which Defendant Peoples disclosed Defendant Dowell's phone number; and (3) admitted into evidence items obtained from Defendant Peoples's Chevrolet Impala. We will first address the issues raised by both defendants and then address those raised solely by Defendant Dowell.

### A. Sufficiency of the Evidence

The defendants both challenge the sufficiency of the evidence used to convict them. Defendant Peoples argues that because none of the victims could identify the perpetrators, the State failed to prove his identity in these crimes. Defendant Dowell argues that the State failed to sufficiently corroborate Moreland's testimony as an accomplice in these crimes. The State responds that there was sufficient evidence upon which a rational trier of fact could have found beyond a reasonable doubt that both defendants committed the essential elements of the offenses of aggravated robbery and especially aggravated kidnapping. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of

review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate

20

inferences'" which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

A conviction for aggravated robbery, as relevant to this case, requires proof beyond a reasonable doubt that the Defendant committed an "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and that the robbery was "accomplished with a deadly weapon or by display of any article fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. §§ 39-13-401(1), -402(1) (2010).

Tennessee Code Annotated section 39-13-305 (2010) provides:
(a) Especially aggravated kidnapping is false imprisonment, as defined in § 39-13-302:

> (1) Accomplished with a deadly weapon or by display of any
> article used or fashioned to lead the victim to reasonably believe
> it to be a deadly weapon;

Tennessee Code Annotated section 39-13-302 (2010) provides that, "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty."

The evidence, viewed in the light most favorable to the State, proves that the defendants, wearing hats, bandanas and gloves, held the Joneses at gunpoint while demanding entry into their home. Upon entry, the Joneses were pushed to the ground and held at gun point while the defendants went through the home looking for money and guns. The defendants took guns, a laptop, a camera, and a gaming system. Apparently, not finding sufficient cash in the house, the men took Ms. Jones's ATM card, and two of the men drove to a nearby ATM and withdrew money from her account. After their return and the completion of the robbery, one of the defendants moved the victims to another location in the house and stood over the victims pointing the gun at them, continuing their confinement, while "jacking shells" after the other men had left.

The defendants then proceeded to enter the Stadler home, wearing hats, bandanas and gloves, with guns drawn. When Stadler showed resistance to the robbery, one of the defendants shot into the chair in which he was sitting. The victims in the Stadler home were then ordered to lie on the ground where they were held at gunpoint. The defendants yelled

21

at the victims, threatened to kill them, and displayed physical violence toward all of the victims in the Stadler residence. The defendants took a laptop computer, some coins, a hunting bag, a hunting knife, a silverware carving knife, and cash. After robbing the victims, and despite the fact that the defendants possessed the ATM cards and PIN numbers, the defendants ordered the victims into Ms. Stadler's Highlander where they were held the victims at gunpoint and drove to two separate ATMs to access money from Stadler's and Ms. Stadler's bank accounts. We find this is sufficient evidence upon which a jury could find the defendants guilty beyond a reasonable doubt of aggravated robbery and especially aggravated kidnapping.

Defendant Dowell argues that the State failed to sufficiently corroborate Moreland's testimony as an accomplice. It is well-settled law in Tennessee that a criminal defendant cannot be convicted solely on the uncorroborated testimony of an accomplice. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994). The law in Tennessee regarding the corroboration required for accomplice testimony has been described as follows:

> The rule simply stated, is that there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994) (citations omitted)). Ultimately, it is a question for the jury to determine whether an accomplice's testimony has been sufficiently corroborated. *Pennington v. State*, 478 S.W.2d 892 (Tenn. Crim. App. 1971).

Our review of the record reveals that Moreland's testimony was sufficiently corroborated. Moreland testified that Defendant Dowell participated in the crimes. He testified that the four men drove to the Jones residence in a silver Buick that the men had stolen in Edgehill. He said that they saw the Joneses getting out of their car and decided to rob them. He said the men were armed and wearing caps, bandanas, and gloves that were later found in Defendant Peoples's car. Moreland said that, after entering the house, they put the Joneses on the floor and searched the house for guns and weapons. After taking what they could find, Defendant Dowell and Defendant Peoples took Ms. Jones's ATM card to a

22

nearby ATM and withdrew money from her bank account. Moreland recounted that the four men then proceeded to the Stadler residence where they once again ordered the victims onto the floor at gunpoint and searched the house for guns and money. After taking items of value, they ordered the victims into Ms. Stadler's SUV and drove to two separate ATMs to withdraw money from Stadler's and Ms. Stadler's bank accounts. Moreland said that the defendants drove to a nearby neighborhood and after learning that the Buick would not run, the defendants left the victims in a neighborhood and drove away in the SUV. These details of the robberies, as described by Moreland, were corroborated by the victims' testimony.

Additionally, caps, bandanas, and gloves were found in Defendant Peoples's car. Defendant Dowell's DNA was found on one of the bandanas found. Cellular phone records placed Defendant Dowell in the area of the crimes at the time of the occurrence. Waters, Defendant Peoples's girlfriend at the time of the offenses, testified that Defendant Peoples admitted he, Defendant Dowell, Harris, and Moreland participated in these crimes. This evidence "fairly and legitimately" connects Defendant Dowell to these crimes. *Shaw*, 37 S.W.3d at 903.

Defendant Peoples attacks the sufficiency of his identity as a perpetrator of these crimes. We acknowledge that the identity of a perpetrator is an essential element of any crime. *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). Issues regarding identity, however, are questions of fact to be determined by the jury. *State v. Vaughn*, 29 S.W.3d 33, 40 (Tenn. Crim. App. 1998). Moreland testified that Defendant Peoples participated in these offenses, and his testimony as an accomplice, as discussed above, was sufficiently corroborated. Waters, Defendant Peoples's girlfriend at the time of the offenses, testified about Defendant Peoples's admission that he committed these crimes. Defendant Peoples owned the car in which bandanas, gloves and caps were recovered. Further, his DNA was present on some of the bandanas, gloves, and caps recovered from his car. The victims described these items of clothing as being worn by the perpetrators of the home invasions, and Moreland testified that the items found in Defendant Peoples's Impala were worn during the commission of the offenses. Cellular phone records indicate that Defendant Peoples was in the areas of the home invasions at the time of the offenses. Based upon this evidence, a jury could find, beyond a reasonable doubt, that the State proved Defendant Peoples's identity as a participant in these crimes.

Accordingly, we conclude there was sufficient evidence for a jury to find Defendant Dowell and Defendant Peoples guilty beyond a reasonable doubt of aggravated robbery and especially aggravated kidnapping. The defendants are not entitled to relief.

### B. Expert Witness Testimony

The defendants assert that the trial court erred by allowing Agent Littlehale to testify as an expert witness. The State responds that, because the defendants made no objection at the time of Agent Littlehale's testimony, they have waived our review of this issue. We agree with the State.

Appellate relief is generally not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); *see State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *see also State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987). Tennessee Rule of Evidence 103 (a)(1) also provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless . . . a timely objection or motion to strike appears of record, stating the specific ground of objection." When a party does not object to the admissibility of evidence, the evidence becomes admissible, notwithstanding any other evidentiary rule to the contrary, and the jury may consider that evidence for its "natural probative effect as if it were in law admissible." *State v. Harrington*, 627 S.W.2d 345, 348 (Tenn. 1981).

After questioning about Agent Littlehale's credentials and experience, the State offered Agent Littlehale as an expert witness in the area of "the use of telecommunications records in criminal investigations." In response, Defendant Peoples's attorney stated "I'm not aware of that being a recognized science." The trial court responded that the qualification was not a science but an area of knowledge pursuant to Tennessee Rule of Evidence 702. The trial court then gave both defense attorneys the opportunity to question Agent Littlehale. Defendant Dowell's attorney questioned Agent Littlehale on his background, knowledge, and the area of communications records. When Defendant Dowell's attorney finished his questioning, Defendant Peoples's attorney declined the trial court's offer to ask any questions, stating that all of his questions had been asked by Defendant Dowell's attorney. No objections were lodged, and the trial court qualified Agent Littlehale as an expert witness. Accordingly, we conclude the defendants waived our review of this issue and are not entitled to relief.

## C. Sentencing

The defendants contend that the trial court erred when it ordered them to serve 100-year effective sentences. The State responds that the defendants have failed to demonstrate that the trial court abused its discretion and, therefore, the sentences should be affirmed. We agree with the State.

24

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In 2005, the Tennessee General Assembly amended the sentencing law in order to bring Tennessee's sentencing scheme into compliance with United States Supreme Court rulings on the subject. *See United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004). As a result, the appellate courts were "left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." *Carter*, 254 S.W.3d at 345-46.

Appellate review of sentences has been *de novo* with a presumption of correctness. *See* T.C.A. § 40-35-401(d) (2010). In a recent decision, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 708; *State v. Christine Caudle*, 338 S.W.3d 273, 278-79 (Tenn. 2012) (explicitly applying the same standard to questions related to probation or any other alternative sentence).

A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In the context of sentencing, as long as the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this Court must presume the sentence to be reasonable. *Bise*, at 704-07. As the *Bise* Court stated, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 708.

The misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from a trial court's sentencing decision. *Id.* A reviewing court should not invalidate a sentence on this basis unless the trial court wholly departed from the principles of the Sentencing Act. *Id.* at 707. So long as there are other reasons consistent with the purpose and principles of sentencing, a sentence within the appropriate

range should be upheld. *Id.*

In conducting its review, this Court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102, -103, -210 (2010); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. *See* T.C.A. § 40-35-401, Sentencing Comm'n Cmts.

The defendants were each convicted of five counts of aggravated robbery and five counts of especially aggravated kidnapping. In considering enhancement factors, the trial court applied enhancement factor (1), the defendants have a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range. T.C.A. § 40-35-114(1) (2010). The trial court also applied to Defendant Dowell's sentences enhancement factor (2), Defendant Dowell was a leader in the commission of an offense involving two or more criminal actors. T.C.A. § 40-35-114(2).

The trial court then considered mitigating factors and found applicable that the defendants released the victims alive. T.C.A. § 39-13-305(b)(2) (2010). The trial court sentenced both defendants to ten years for each of the aggravated robbery convictions and twenty years for each of the especially aggravated robbery convictions. The trial court then considered consecutive sentencing and found that the defendants were dangerous offenders whose behavior indicated little or no regard for human life and they had no hesitation about committing a crime in which the risk to human life is high. T.C.A. § 40-35-115(4). The trial court found that the aggregate term, 100 years, reasonably related to the severity of these offenses and that it was necessary to protect the public. The trial court noted that the defendants intentionally entered homes with guns where they knew people were present. In ordering the sentences to run consecutively to one another, the trial court also addressed the fact that the defendants continued to commit crimes with weapons, killing the victim in that instance, after the occurrence of these offenses.

In this case, the trial court set each of the defendants' sentences at the mid-point of the applicable range. Defendant Dowell argues that the trial court improperly weighed the mitigating factor and misapplied enhancement factor (2). The 2005 amendments, however, deleted, as grounds for appeal, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9. As to the

26

trial court's application of enhancement factor (2), that Defendant Dowell was the leader in an offense involving two or more criminal actors, the record supports the trial court's application of this factor. There were four men involved in the commission of these crimes, and Stadler testified that the person giving the orders was the shortest of the men, Defendant Dowell.

Defendant Dowell also argues that the trial court improperly found that he is a dangerous offender for purposes of consecutive sentencing. As the trial court correctly noted, in *State v. Wilkerson*, 905 S.W.2d 933 (Tenn.1995), our Supreme Court set forth additional requirements for consecutive sentences when the defendant is a "dangerous offender." Accordingly, in order to base consecutive sentencing on the dangerous offender category, the trial court must find: (1) that the term imposed "necessary in order to protect the public from further criminal acts by the offender;" and (2) "that the terms imposed are reasonably related to the severity of the offenses committed." *Id*. at 938. The record supports the trial court's finding that Defendant Dowell is a dangerous offender for purposes of consecutive sentencing. Accordingly, we conclude Defendant Dowell is not entitled to relief.

Defendant Peoples argues that the aggregate sentence of 100 years violates the separation of powers because the trial court has ordered an effective life sentence despite the legislature's restriction of life sentences to first degree murder convictions. The trial court, however, sentenced Defendant Peoples to mid-range for each of his convictions. The legislature has provided for both the sentencing ranges and consecutive sentencing applied by the trial court. The trial court correctly ordered sentences within the range for each crime, and then properly applied a statutory factor warranting consecutive sentencing in this case. Accordingly, Defendant Peoples is not entitled to relief.

### D. Trial Court's Failure to Define "Substantial Interference"

The defendants assert that the trial court's failure to define "substantial interference with the victim's liberty" during the jury instruction as it relates to especially aggravated kidnapping was in error pursuant to *State v. White*, 362 S.W.3d 559 (Tenn. 2012). The State responds that *White* is inapplicable because the convictions, while arising from a continuous series of distinct criminal conduct, constituted separate criminal episodes. Alternatively, the State asserts that if this Court finds the offenses arose from the same incident, the omission of the jury instruction was harmless beyond a reasonable doubt.

An understanding of the *White* case, on which the defendants rely, requires a brief history of the developments in this area of the law. In *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991), our Supreme Court for the first time considered "the propriety of a kidnapping

conviction where detention of the victim is merely incidental to the commission of another felony, such as robbery or rape." *Anthony*, 817 S.W.2d at 300. The high court acknowledged that a period of confinement technically meeting the definition of kidnapping frequently accompanies such crimes as robbery and rape and concluded that a separate kidnapping conviction cannot be supported when "the confinement, movement, or detention [was] essentially incidental to the accompanying felony." *Id.* at 305. Specifically, *Anthony* required reviewing courts to determine "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction." *Id*. at 306.

Since its decision in *Anthony*, the Supreme Court has issued a series of cases addressing the ruling. In *State v. Dixon*, 957 S.W.2d 532 (Tenn. 1997), the Court observed:

> *Anthony* and its progeny, however, are not meant to provide the rapist a free kidnapping merely because he also committed rape. The *Anthony* decision should only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape or robbery. Accordingly, any restraint in addition to that which is necessary to consummate rape or robbery may support a separate conviction for kidnapping.

*Id.* at 534–35. The *Dixon* court also added a second level of inquiry to the *Anthony* analysis, concluding that where the confinement is beyond that necessary for the accompanying felony, a court must next determine "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." *Id*. at 535. Finally, the *Dixon* court emphasized that the focus of any *Anthony* inquiry should be on "the purpose of the removal or confinement and not the distance or duration." *Id*.

Most recently, in *State v. White*, 362 S.W.3d 559 (Tenn. 2012), our Supreme Court again addressed the precedent originally developed in *Anthony* and held "that whether the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law." *White*, 362 S.W.3d at 577 . In so holding, the Court expressly overruled *Anthony*, *Dixon*, and all their progeny, specifically concluding that "[t]he separate due process test articulated first in *Anthony*, and subsequently refined in *Dixon* and its progeny, is, therefore, no longer necessary to the appellate review of a kidnapping conviction accompanied by a separate felony." *Id*. at 578. Instead, the Court held, the jury's finding beyond a reasonable doubt all

28

of the elements of kidnapping coupled with the reviewing court's "task ... of assessing the sufficiency of the convicting evidence" is sufficient to protect the defendant's due process rights. *Id*.

Although it overruled the line of cases requiring a legal, as opposed to a factual due process evaluation, the Court retained the requirement that the State establish that the removal or confinement of the victim went beyond that necessary to accomplish the accompanying offense, classifying it as a question of fact to be determined by a jury "properly instructed under the law." *Id*. at 577.

The Court determined that the requirement that the removal or confinement be more than essentially incidental to the other offense informs the "definition for the element of the offense requiring that the removal or confinement constitute a substantial interference with the victim's liberty." *Id*. Having thus concluded, the Supreme Court ruled that, to protect the defendant's due process rights, the jury should be instructed that it must determine that the removal or confinement of the victim was "significant enough, standing alone" to support a conviction of kidnapping before imposing one when an overlapping felony accompanies the kidnapping charge. *Id*. The Supreme Court also developed a jury instruction to be provided to facilitate the juror's determination of whether the removal or confinement was essentially incidental to the accompanying offense. *See id*. at 580–81. The Court found that the *White* jury had not been instructed on the "key" element of false imprisonment, that "substantial interference with the victim's liberty" required "a finding ... that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." *Id*. at 580. The Supreme Court granted *White* a new trial on the basis of the "instructional error." *Id*.

The present cases were tried in 2011, before *White* was decided, and therefore without the benefit of the jury instruction provided in *White*. Although in *White* our Supreme Court classified its ruling as one that did not require retroactive application, several cases have since been remanded for reconsideration in light of the ruling in *White*. *See,* e.g., *State v. Robert Fusco*, No. M2012-01068-CCA-RM-CD, 2012 WL 61062856, at *18 (Tenn. Crim. App., at Nashville, Dec. 6, 2012). Thus, we utilize the ruling in *White* to analyze the issue in this case. *See State v. Osby*, W2012-00408-CCA-R3-CD, 2012 WL 5381371 (Tenn. Crim. App., at Jackson, Nov. 2, 2012)

Our review of the record reveals that the issue of whether the defendants substantially interfered with the victims' liberty in the face of the companion charge of aggravated robbery was fairly raised by the evidence. The trial court did not charge the jury with the instruction prescribed in *White* because *White* had not yet been filed. Thus, we review this omission to determine whether it necessitates reversal or is harmless beyond a reasonable doubt.

We consider here the harmful effect of the trial court's failure to instruct the jury that the "key element—the substantial interference with the victim's liberty—[requires] a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." *White*, 362 S.W.3d at 580; *see also id.* n. 20 (indicating that the issue is subject to constitutional harmless error analysis by stating that remand for a new trial was warranted in *White* because the court could not "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the instructional error"). The error in this case can be classified as harmless beyond a reasonable doubt. Proof that the victims' removal or confinement went beyond that necessary to accomplish the accompanying felonies was overwhelming. In both cases, the defendants had completed the home robbery and additionally possessed the means to steal money directly from the victims accounts, i.e. the bank card and pin number. The defendants, however, continued to hold the victims at gunpoint either in their home or in the car. These acts constitute confinement that is beyond what was necessary to accomplish the accompanying offense. We conclude that the jury's verdict would have been the same had it been instructed with the *White* instruction on this issue. The defendants are not entitled to relief.

### E. Breach of an Immunity Agreement

Defendant Dowell asserts that the trial court erred when it denied his motion to dismiss the indictment based upon the State's breach of an "immunity 'cooperation' agreement." The State responds that Defendant Dowell has waived this issue by failing to include the trial court's ruling on the motion. The State further contends that, even so, the denial of Defendant Dowell's motion to dismiss the indictment based upon the enforcement of an immunity agreement was proper. We agree with the State.

The State correctly points out the Defendant's failure to include the trial court's ruling on his motion. We note that defendants have a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to the issues which form the basis of the appeal" and will enable the appellate court to decide the issues. T.R.A.P. 24(a); *see State v. Taylor*, 992 S.W.2d 941, 944 (Tenn. 1999).

> It is well-established that an appellate court is precluded from considering an issue when the record does not contain a transcript or statement of what transpired in the trial court with respect to that issue. Moreover, the appellate court must conclusively presume that the ruling of the trial judge was correct, the evidence was sufficient to support the defendant's conviction, or the defendant received a fair and impartial trial. In summary, a defendant is effectively denied appellate review of an issue when the record transmitted to the appellate court does not contain a transcription of the relevant proceedings in the trial court.

30

*State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990).

At the conclusion of the motion hearing, the trial court took Defendant Dowell's motion under advisement and stated an order would be forthcoming. The record, however, contains no order disposing of the motion. Although it would appear the trial court denied the motion, there are no findings of fact or conclusions of law for this Court to review. Because there is nothing for this Court to review, we must presume the trial court's ruling was supported by the evidence. *See State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

We do note, however, upon reviewing the testimony from the hearing, that there was ample evidence to support a denial of the motion. The ADA testified that he sought Defendant Dowell's cooperation in the home invasion cases. The ADA made clear that, if Defendant Dowell cooperated and testified against Defendant Peoples, the ADA "would resolve something on the murder [charge] and . . . not on the home invasions." The ADA testified that he told Defendant Dowell that any agreement was contingent upon Defendant Dowell's "cooperation," "truthfulness," and "honesty." Thereafter, the ADA found out about a letter Defendant Dowell wrote to Defendant Peoples's attorney stating that he had lied to the ADA about Defendant Peoples's involvement.

The record is clear that Defendant Dowell failed to fulfill his obligation to be honest and truthful. It is undisputed that Defendant Dowell agreed to cooperate with the State and testify against Defendant Peoples. He provided detectives and the ADA with information regarding the home invasions. He then wrote a letter to Defendant Peoples's attorney completely contradicting his earlier statements. Whether he lied to the ADA and detectives regarding Defendant Peoples's involvement or he lied in his letter to Defendant Peoples's attorney absolving Defendant Peoples from the crimes, he violated his agreement with the State to be truthful and honest. Accordingly, the Defendant is not entitled to relief as to this issue.

### F. Evidence found in Defendant Peoples's Impala

Defendant Dowell asserts that the trial court erred when it overruled his objection to the introduction of evidence found in Defendant Peoples's Impala. He contends that this evidence is inadmissible because the State failed to establish the relevance of this evidence. The State responds that the trial court properly determined that this evidence was relevant evidence. We agree with the State.

The admission of evidence is a matter within the trial court's discretion, and a decision to admit or exclude evidence will not be disturbed on appeal absent a clear abuse of that

discretion. *State v. Carroll*, 36 S.W.3d 854, 867 (Tenn. Crim. App. 1999). Rule 401 of the Tennessee Rules of Evidence provides that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. T.R.E. 402.

The State introduced gloves, bandannas, and caps recovered from Defendant Peoples' Chevrolet Impala. The victims of both home invasions testified that the perpetrators wore gloves, bandannas, and caps. Moreland testified that the gloves, bandannas, and caps found in the Impala were the items worn during these offenses. Finally, DNA testing revealed the presence of DNA attributable to Harris, Moreland, Defendant Peoples, and Defendant Dowell. Therefore, the gloves, bandannas, and caps found in the Impala were relevant to the ultimate issue of the defendants's involvement in these offenses. Accordingly, we conclude the trial court acted within its discretion when it admitted these items into evidence. Defendant Dowell is not entitled to relief as to this issue.

## G.  Admission of Sales Contract

Defendant Dowell asserts that the trial court erred when it denied his motion in limine to exclude the sales contract from Defendant Peoples's purchase of the Impala which contained the names and telephone numbers of each of the defendants in the case. The State responds that Defendant Dowell has waived our review of this issue for failure to include the transcript of the hearing in the record. We agree with the State.

As we previously stated, the defendant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to the issues which form the basis of the appeal" and will enable the appellate court to decide the issues. T.R.A.P. 24(a); *see State v. Taylor*, 992 S.W.2d 941, 944 (Tenn. 1999).

It is well-established that an appellate court is precluded from considering an issue when the record does not contain a transcript or statement of what transpired in the trial court with respect to that issue. Moreover, the appellate court must conclusively presume that the ruling of the trial judge was correct, the evidence was sufficient to support the defendant's conviction, or the defendant received a fair and impartial trial. In summary, a defendant is effectively denied appellate review of an issue when the record transmitted to the appellate court does not contain a transcription of the relevant proceedings in the trial court.

*State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990).

Defendant Dowell has failed to include both the transcript of the hearing on his motion and the trial court's order disposing of the issue, therefore, leaving nothing for this Court to review. Because there is nothing for this Court to review, we must presume the trial court's ruling was supported by the evidence. *See Oody*, 823 S.W.2d at 559. Accordingly, Defendant Dowell is not entitled to relief as to this issue.

### III. Conclusion

Based on the foregoing reasoning and analysis, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE